SOUTH YUBA RIVER CITIZENS
LEAGUE and FRIENDS OF THE
RIVER,

                                  NO. CIV. S-06-2845 LKK/JFM

       Plaintiffs,

   v.                              O R D E R

NATIONAL MARINE FISHERIES
SERVICE, et al.,

       Defendants.

_____/

    Plaintiff environmental groups bring various claims arising primarily out of the structure and operation of two dams on the South Yuba River. The Sixth Amended Complaint brings claims under the Administrative Procedures Act ("APA") and the Endangered Species Act's ("ESA") citizen suit provision, alleging that the various defendants violated provisions of the ESA.

    Plaintiffs' fourth claim for relief alleges that the Army Corps of Engineers violated the ESA's prohibition on "take" of

protected species in its operation and licensing of the two dams. The National Marine Fisheries Service issued an "incidental take statement" ("ITS") for these operations, which serves to shield the Corps from liability for take provided that the Corps complies with the ITS.

Plaintiffs allege that the Corps is liable notwithstanding this ITS, because either the ITS itself is invalid, or because the Corps has failed to comply with the terms of the ITS. The federal defendants' present motion argues that the latter of these allegations cannot support an ESA citizen suit. Accordingly, federal defendants move to dismiss this aspect of plaintiff's fourth claim. Defendants' motion is brought as a motion to dismiss for lack of subject matter jurisdiction, arguing that plaintiffs' claim exceeds the scope of the waiver of sovereign immunity effectuated by the ESA.

## I. BACKGROUND

### A.    Statutory Background

Although this court has often repeated the contours of the ESA, another review of this terrain is appropriate. The obligations imposed by the ESA are discussed in this section, and are not disputed by the parties. The ESA's various enforcement mechanisms, whose scope and interactions are disputed, are discussed in the analysis section below.

The ESA's core protection is section 9's prohibition of "take" of a proteced species by any person. ESA § 9(a), 16 U.S.C. § 1538(a). "Take" includes acts that "harm" individual protected

organisms, including such harm caused by habitat modifications. ESA § 3(19); 16 U.S.C. § 1532(19); see also Babbit v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 708 (1995), id. at 713 (O'Connor, J., concurring). This prohibition applies to private parties as well as state and federal agencies.

Section 7 of the ESA applies to federal agencies, and operates to both impose further requirements on federal actions and to exclude some federal acts from the scope of section 9. Every federal agency, before undertaking an "action authorized, funded, or carried out by" that agency, must ensure that the action is not likely to jeopardize the continued existence of a protected species or harm the critical habitat of a protected species. ESA § 7(a)(2); 16 U.S.C. § 1536(a)(2). When effects on protected species are likely, the agency must go through a formal consultation process with the Fish and Wildlife Service or National Marine Fisheries Service ("NMFS").[1] Here, this process directed NMFS to prepare a "biological opinion" ("BiOp"). ESA § 7(b)(3); 16 U.S.C. § 1536(b)(3).

If a BiOp concludes that the proposed action (or its reasonable and prudent alternative) will cause incidental taking of protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, NMFS

> shall provide the Federal agency and the applicant concerned, if any with a written

---

[1] In the ESA context, "Services" is often used to refer to FWS and NMFS, whereas "agency" or "action agency" is used to refer to other agencies consulting with the services.

statement that --

    (i) specifies the impact of such incidental taking on the species,

    (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

    (iii) . . . , and

    (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

ESA § 7(b)(4); 16 U.S.C. § 1536(b)(4). This statement is referred to as an "Incidental Take Statement" ("ITS"). Section 7 further provides that "any taking that is in compliance with the terms and conditions specified in a written [ITS] . . . shall not be considered to be a prohibited taking of the species concerned." ESA § 7(o)(2); 16 U.S.C. § 1536(o)(2).

A related provision, not directly at issue in this case but interpreted by cases cited by defendants, governs incidental take by private parties. Section 10 of the ESA authorizes FWS and NMFS to issue an incidental take permit ("ITP") "under such terms and conditions as [the service] may prescribe." ESA § 10(a)(1); 16 U.S.C. § 1539(a)(1). As with incidental take statements, incidental take permits may excuse take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." ESA § 10(a)(1)(B); 16 U.S.C. § 1539(a)(1)(B). An applicant for an ITP must submit a habitat conservation plan

4

demonstrating that, inter alia, the take "will not appreciably reduce the likelihood of the survival and recovery [of the species] in the wild."  ESA § 10(a)(2)(B)(iv).

**B.    Factual Background**

This case focuses on the operation of the Daguerre and Engelbright dams on the Yuba River.  Both dams allegedly harm three fish species--the central valley spring-run Chinook, central valley Steelhead and Green Sturgeon--by causing take of individual fish and by jeopardizing the continued existence of the species.

Both dams are maintained and operated by defendant Army Corps of Engineers ("Corps"), and the plaintiffs challenge the Corps' operation of these dams.  As an adjunct to these dams, the Corps authorizes other entities to operate other diversions along the river.  One such diversion is challenged in this suit, the South Yuba-Brophy Diversion, owned and operated by defendant Yuba County Water Agency ("YCWA").

NMFS has issued a series of three BiOps, each accompanied by an ITS, for the dams and associated diversions.  Only the most recent, issued in November of 2007, is at issue in the present motion.  The November 2007 ITS imposes the following conditions on the Corps, as summarized by the federal defendants:

> 1.    Develop and implement a long-term gravel augmentation program within three years;
>
> 2.    Develop and implement, within four years, a program to replenish large woody material in the lower Yuba River;
>
> 3A.   Complete the feasibility study for improving fish passage at Daguerre Point Dam within five

1         years;

2      3B.    Commence implementing the preferred fish
               passage alternative at Daguerre within ten
3               years;

4      4.     Continue the current fish ladder clearing and
               sediment management programs until the large
5               woody material replenishment program is
               implemented; and
6

7      5.     Diligently pursue the ongoing effort to fully
               screen the South Yuba-Brophy irrigation
               diversion to meet all DFG and NMFS screening
8               criteria.

9     Plaintiffs' fourth claim in the Sixth Amended Complaint

10 alleges that notwithstanding the ITS, the Corps is liable for

11 causing take of protected species in violation of section 9 of the

12 ESA.   As discussed above, this claim alleges two theories of

13 liability.  The theory challenged by the federal defendants alleges

14 that:

15         the Corps's operation and/or licensing of the
            Project has not (a) complied with these BiOps'
16          terms and conditions, (b) met the ecological
            surrogates of the April 2007 BiOp and November
17          2007 BiOp, and included implementation of the
            conservation and restoration measures
18          specified in the April 2007 BiOp and November
            2007 BiOp.   Accordingly, the Corps has lost
19          any authorization for its take of the Listed
            Species that could be provided by the BiOps
20          and their attendant ITS and the Corps' take of
            the Listed Species has necessarily been
21          non-incidental and unlawful.

22 Sixth Amended Complaint, ¶ 112.  The complaint then enumerates a

23 variety of ways in which the operation and licensing of the project

24 has allegedly caused take.  Those allegations are not at issue in

25 the present motion.

26 ////

**II. STANDARD FOR A FED. R. CIV. P. 12(b)(1) MOTION TO DISMISS**

It is well established that the party seeking to invoke the jurisdiction of the federal court has the burden of establishing that jurisdiction exists. <u>KVOS, Inc. v. Associated Press</u>, 299 U.S. 269, 278 (1936); <u>Assoc. of Medical Colleges v. United States</u>, 217 F.3d 770, 778-779 (9th Cir. 2000). On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the standards that must be applied vary according to the nature of the jurisdictional challenge.

Here, the challenge to jurisdiction is a facial attack. That is, the federal defendants contend that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction. <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). In a Rule 12(b)(1) motion of this type, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made. <u>See</u> <u>Sea Vessel Inc. v. Reyes</u>, 23 F.3d 345, 347 (11th Cir. 1994), <u>Osborn v. United States</u>, 918 F.2d 724, 729 n.6 (8th Cir. 1990); <u>see also</u> 2-12 Moore's Federal Practice - Civil § 12.30 (2009). The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction. <u>Savage v. Glendale Union High Sch. Dist. No. 205</u>, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003), <u>Miranda v. Reno</u>, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).

### III. ANALYSIS

Before discussing the parties' arguments, the court confesses

to some surprise at the paucity of caselaw considering claims of this type. The relevant provisions of the ESA have existed in their current forms for over two decades, and the federal courts have not wanted for ESA litigation. Yet this court is aware of only one case evaluating an analogous claim, i.e., a citizen suit brought against the recipient of an ITS, alleging that by causing take without complying with the terms of the ITS, the recipient had caused take in violation of section 9. Mount Graham Red Squirrel v. Espy, 986 F.2d 1568, 1580 (9th Cir. 1993).

As explained below, Mount Graham implicitly endorsed suits of this type. That, however, does not end the inquiry, because that case did not discuss the argument advanced by the federal defendants here. The court agrees with defendants that the ESA's citizen suit provision, section 11(g), does not encompass actions seeking to enforce a permit, and that the ITS, in at least some relevant senses, is a permit. The court concludes, however, that section 11(g)'s implied exclusion of suits seeking to enforce a permit does not apply to plaintiffs' claim, because the Ninth Circuit has repeatedly referred to taking not in compliance with an ITS as a violation of the statute itself. Moreover, section 11(g) permits certain other claims even when those claims will require plaintiffs to prove a violation of an ITS. This conclusion does not disregard the implied exclusion, but holds that it excludes claims other than that which is before the court.

Notwithstanding the above, defendants' argument raises a close question. Defendants present a plausible interpretation of the

8

statutory scheme. In light of the Ninth Circuit authority providing implied support for plaintiffs' position, however, and the dearth of authority adopting defendants' interpretation, this court denies defendants' motion to dismiss.

**A.   Mount Graham**

As noted above, this court is aware of only one opinion evaluating a citizen suit claiming that an agency violated section 9's prohibition of take despite having a valid ITS. <u>Mount Graham Red Squirrel</u>, 986 F.2d at 1580. In <u>Mount Graham</u>, the United States Forest Service had received an ITS regarding taking of red squirrels incidental to construction of telescopes in a national forest. <u>Id.</u> at 1570. The ITS authorized Forest Service employees to trap and tag squirrels in order to monitor their population, and to incidentally take up to six squirrels per year. <u>Id.</u> at 1580. Plaintiffs argued that the Forest Service violated section 9 when two squirrels were killed by employees who trapped them without using procedures advocated by one FWS biologist, although these procedures were not incorporated into the ITS or any Forest Service policy. <u>Id.</u> The Ninth Circuit held that even if these deaths resulted from mishandling of the squirrels, "the two deaths were covered by the incidental take limit, and removed from the ambit of section 9 of the ESA by the terms of [the ITS]." <u>Id.</u> Thus, <u>Mount Graham</u> implied that plaintiffs could bring a citizen suit alleging that take had occurred in violation of the ITS's conditions, but held that plaintiffs' suit failed because the

1  applicable condition--the ceiling on take--had not been violated.[2]

2      The parties have not identified any distinction between an ITS

3  provision putting a ceiling on take and the ITS provisions at issue

4  here.   Mount Graham therefore provides implicit support for

5  plaintiffs' suit.   Nonetheless, Mount Graham did not discuss

6  whether the claim impermissibly sought to enforce a permit.   The

7  court therefore turns to this argument.

8  **B.   The ESA's Citizen Suit Provision Implicitly Distinguishes**

9      **Enforcement of Statutory Provision from Enforcement of**

10     **Permits**

11     In contrast with the other enforcement provisions of the ESA,

12  and   with   the   citizen   suit   provisions   of   numerous   other

13  environmental statutes, the ESA's citizen suit provision does not

14  refer to alleged violations of permits issued under the Act.   The

15  court must presume that this omission represents a deliberate

16  exclusion of some claims from the scope of the citizen suit

17  provision.   This exclusion limits the extent to which the ESA

18  constitutes a waiver of sovereign immunity, and by extension, this

19  court's subject matter jurisdiction over suits against federal

20  agencies.

21  ////

22  ////

23  _____

24      [2] At oral argument, the federal defendants argued that the
   relevant claim in Mount Graham was a breach of the duty to
   reinitiate consultation under section 7, rather than the duty to
25  avoid take under section 9.  Although Mount Graham did not discuss
   the remedies sought pursuant to plaintiffs' claim, it clearly
26  discussed an alleged violation of section 9.

1          **1.   Section 11(g) Omits Reference to Violations of Permits**
2                 **or Licences**

3          Section 11(g)(1) of the ESA authorizes citizen suits "to
4    enjoin any person . . . who is alleged to be in violation of any
5    provision of this chapter or regulation issued under the authority
6    thereof."  By specifically referring to violations of the statute
7    and the implementing regulations, but not to violations of permits
8    issued under the statute, section 11(g) differs from the ESA's
9    other enforcement provisions, and from the citizen suit provisions
10   provided by other environmental statutes.   In light of this
11   distinction, the court must conclude that Congress did not intend
12   to authorize citizen suits to enforce ESA permits.

13         Section 11 of the ESA, in addition to providing for citizen
14   suits, provides for imposition of civil penalties by NMFS and FWS,
15   for criminal penalties, and for administrative enforcement by
16   various agencies.  ESA §§ 11(a), (b), (e).  These three enforcement
17   provisions explicitly refer to violations of permits.   Section
18   11(a)(1) authorizes FWS and NMFS to impose a civil penalty for
19   knowing violations "of any provision of this chapter, or any
20   regulation, <u>permit, or certificate</u> issued hereunder."   Section
21   11(b)(1) establishes criminal penalties using the same language,
22   for knowing violations "of any provision of this chapter, or any
23   regulation, <u>permit, or certificate</u> issued hereunder."   Section
24   11(e)(1) establishes that "The provisions of this Act and any
25   regulations or <u>permits</u> issued pursuant thereto shall be enforced
26   by" various federal agencies.  (emphasis added in each of the above

three quotes).  Thus, Congress chose to provide for enforcement of permits in many of the ESA's enforcement provisions, but not in the citizen suit provision.  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Bates v. United States, 522 U.S. 23, 29-30 (1997).  Applying this canon of interpretation to a separate provision of the ESA, the Ninth Circuit has held when Congress included a public notice requirement in two provisions of the ESA, sections 4(b)(6)(A)(i)(III)-(IV), but not in two others, sections 4(b)(6)(A)(i)(I)-(II), i.e. Congress did not intend to impose the notice requirement on actions undertaken pursuant to the later sections ((I) and (II)).  Ctr. for Biological Diversity v. United States Fish & Wildlife Serv., 450 F.3d 930, 939 (9th Cir. 2006).

The ESA's citizen suit provision also stands in contrast with the citizen suit provisions of other federal environmental statutes, which explicitly provide for citizen enforcement of permits.  See Clean Water Act §§ 505(a), (f)(6), 33 U.S.C. § 1365; Clean Air Act §§ 304(a)(1)(A), (f)(3)-(4), 42 U.S.C. § 7604; Resource Conservation and Recovery Act § 7002(a)(1)(A), 42 U.S.C. § 6972; Ocean Dumping Act § 105(g)(1), 33 U.S.C. § 1415; Surface Mining and Control Reclamation Act § 520(a)(1), 30 U.S.C. § 1270. Congress's decision to deviate from the model used by other statutes in drafting the ESA's citizen suit provision indicates that the ESA citizen suit provision is not intended to encompass

actions seeking to enforce permits.

Accordingly, several district courts have held that permits issued under the ESA may not be enforced through ESA citizen suits. In <u>ASPCA v. Ringling Brothers and Barnum & Bailey</u>, 502 F. Supp. 2d 103 (D.D.C. 2007), the plaintiff claimed that the Ringling Brothers Circus's treatment of Asian elephants was violating the terms of a captive-bred-wildlife permit issued pursuant to Section 9 and 50 C.F.R. § 17.3. The court held that the ESA's citizen suit provision did not authorize the plaintiff's claim, because "[b]y specifically referencing permits in subsections (a), (b), and (e) of Section 11 . . . but not referencing permits in subsection (g), Congress evidenced its intent to preclude private parties from permit enforcement." <u>Ringling Bros.</u>, 502 F. Supp. 2d at 112. Similarly, the Middle District of Florida has held that the ESA "does not provide a private enforcement mechanism covering the terms and conditions of incidental take permits." <u>Atlantic Green Sea Turtle v. County Council of Volusia County</u>, No. 04-CV-1576-ORL-31-KRS, 2005 WL 1227305 at *14 (M.D. Fla. May 3, 2005).

**2.    This Omission Constitutes A Limit on The Waiver of Sovereign Immunity Effectuated by The ESA**

The federal defendants bring this motion under Fed. R. Civ. P. 12(b)(1), rather than Rule 12(b)(6). In so doing, they argue that the court lacks subject matter over the claim, because it is a claim against the federal government for which the government has not waived sovereign immunity. Although the ESA's citizen suit provision itself is a waiver of sovereign immunity, if a claim

exceeds the scope of the citizen suit provision, it also exceeds the scope of the waiver, and the government is therefore immune from suit.

Because federal courts have an obligation to confirm subject matter jurisdiction before proceeding to the merits, had defendants' argument been raised in <u>Mount Graham</u>, that court would have been obligated to address it before considering the merits of the claim in that case. However, sovereign immunity, although jurisdictional, presents an affirmative defense, and may not have been raised by defendants in that case.

**C.   An ITS Is A "Permit" In At Least Some Senses**

The ESA does not define a "permit," for purposes of section 11 or otherwise. Nonetheless, the Supreme Court has stated in dicta that "the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.'" <u>Bennett v. Spear</u>, 520 U.S. 154, 170 (1997).[3] The Court went on to explain that an agency takes species without complying with an ITS "does so at its own peril," citing sections 11(a) and (b) and discussing these sections' provision of civil and criminal penalties, but not citing section

_____

[3] As the Ninth Circuit has recognized, Supreme Court dicta is to be treated with "due deference." <u>U.S. v. Baird</u>, 85 F.3d 450, 453 (9th Cir. 2002). The court also notes that <u>Mount Graham</u> was decided prior to <u>Bennett</u>.

11(g), the citizen suit provision.[4]  Id.

In addition, this court held, in a prior order in this case, that an ITS was a license within the meaning of section 551(8) of the Administrative Procedure Act.  Order of Oct. 16, 2007, Doc. 77, at 21; 5 U.S.C. § 551(8).  Under consideration was plaintiffs' claim that, in delaying issuance of an ITS, NMFS had violated section 558(c) of the Administrative Procedures Act, which requires applications for licenses to be acted on "within a reasonable time."  Order at 21.  APA section 551(8) defines "license" to include "the whole or part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  This court held that an ITS was "a form of permission" under the APA, such that "[n]othing in the plain language of the APA and ESA, nor the Ninth Circuit's description of the ITS, suggests to this court that the ITS as a matter of law cannot be considered a license under the APA."  Id. at 21-22.

**D.    Plaintiffs Allege Violations of Provisions of Both The Permit and The Statute**

In arguing that section 11(g) does not encompass actions to enforce permits, federal defendants seek to draw a dichotomy between violations of permits and violations of the ESA and its

_____

[4] Although the Supreme Court's citation to ESA §§ 11(a) and (b), but not § 11(g), may imply that citizen suits under § 11(g) are not available for ITS violations, it might instead merely reflect the fact that unlike §§ 11(a) and (b), § 11(g) provides only for injunctive relief, and therefore does not subject the services to "peril."

regulations.  However, plaintiffs' claim alleges a violation of both section 9 and the ITS.  Section 11(g) allows citizen suits that "allege[] . . . [a] violation of" the statute.  The question is whether, notwithstanding plaintiffs' allegation of a statutory violation, the claim is precluded by the fact that it also turns on an alleged violation of the ITS.

**1.  Plaintiffs Allege That by Violating The ITS and Causing Take, The Corps Violated ESA § 9**

Section 7(o)(2) of the ESA provides that "any taking that is in compliance with the terms and conditions specified in an [ITS] shall not be considered to be a prohibited taking of the species concerned."  Thus, even if an ITS has been issued, if the terms of the ITS are violated, any taking (incidental or otherwise) is directly prohibited by section 9.

As discussed above, <u>Mount Graham</u> implied that section 11(g) encompassed a claim that because an ITS recipient had caused incidental take that violated the limits imposed by the ITS, the recipient had violated section 9.  986 F.2d at 1580.  In addition, in dicta summarizing the effect of ITSs, the Ninth Circuit has repeatedly stated that non-compliance with an ITS subjects the receiving agency to liability under section 9, although these cases did not specifically address whether such liability could support a citizen suit.  See <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>, 481 F.3d 1224, 1230 (9th Cir. 2007) (An "'Incidental Take Statement' . . . , if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA."), <u>Ariz.</u>

16

<u>Cattle Growers' Ass'n v. United States Fish & Wildlife, BLM</u>, 273 F.3d 1229, 1239 (9th Cir. 2001) ("if the terms and conditions of the Incidental Take Statement are disregarded and a taking does occur, the action agency or the applicant may be subject to potentially severe civil and criminal penalties under Section 9."), <u>Ramsey v. Kantor</u>, 96 F.3d 434, 442 (9th Cir. 1996) (Actions "contemplated by an incidental take statement issued under Section 7 of the ESA and . . . conducted in compliance with the requirements of that statement" do not violate section 9.).

In this regard, the Ninth Circuit's interpretation of the ITS provision, section 7(b)(4), differs sharply from the interpretation of the effect Incidental Take Permits adopted by <u>Atl. Green Sea Turtle v. County Council of Volusia County Fla.</u>, 2005 U.S. Dist. LEXIS 38841 (M.D. Fla. May 3, 2005). In that case, the Middle District of Florida held that:

> Liability under ESA section 1538(a)(1)(B) expressly requires section 1539 to be inapplicable: "except as provided in section[] . . . 1539 of [the ESA] . . . it is unlawful for any person . . . to take [listed] species. . . ." <u>Id.</u> Section 1539 provides inter alia that "the Secretary may permit, under such terms and conditions as he shall prescribe, any taking otherwise prohibited by section 1538(a)(1)(B). . . ." <u>Id.</u> § 1539(a)(1)(B) (emphasis added). Although, at first blush, it might appear plausible to read the terms-and-conditions clause as a limit beyond which section 1538(a)(1)(B) applies, that is not so.

<u>Id.</u> at *43 (modifications and omissions in original). The court went on to hold that when an ITP holder violates the terms of an ITP, the permitee has violated the permit, but not section 9, such

17

that any enforcement occurs under section 10 (relating to ITPs). Regardless of whether this interpretation is correct as applied to ITPs, it does not reflect the manner in which the Ninth Circuit has interpreted ITSs. <u>Ariz. Cattle Growers' Ass'n</u>, 273 F.3d at 1239 ("if the terms and conditions of the [ITS] are disregarded . . . the action agency . . . may be subject to . . . penalties <u>under Section 9</u> [16 U.S.C. 1538].") (emphasis added).

This conclusion is consistent with this court's prior order holding that an ITS was a license for purposes of the APA. In arguing that the ITS was not a license or permit, defendants earlier argued that the ITS was instead a safe harbor from liability. Defendants now argue that, in concluding that the ITS is a license, (a) the court rejected the view that the ITS is a safe harbor, and (b) this rejection precludes concluding that take not in compliance with an ITS directly violates section 9. Defendants provide no argument elaborating, or authority for, either proposition. In this absence, the court cannot conclude that the earlier order prohibits the court's present conclusion. On the contrary, it appears to the court that the defendants' either/or analysis is without foundation. There is no reason that an ITS cannot be both a license and provide a safe harbor. Indeed, the language of the statute suggests just that, i.e., that an ITS is a license which provides a safe harbor.

Thus, plaintiffs have alleged a violation of a statutory provision and this provision is not a mere command to obey the terms of permits. The court recognizes that Section 11(g)'s

exclusion of suits over violations of permits would be meaningless if it could be circumvented merely by pointing to a statutory or regulatory obligation to comply with the permit. For example, in a case considering an alleged violation of a captive-bred wildlife permit, one district court held that plaintiffs could not escape section 11(g)'s exclusion by referring to a regulatory obligation to "'comply with all conditions of the permit and with all applicable laws and regulations governing the permitted activity.'" ASPCA v. Ringling Bros. & Barnum & Bailey Circus, 502 F. Supp. 2d 103, 113 (D.D.C. 2007) (quoting 50 C.F.R. § 13.48). Section 9, however, differs from the regulation at issue in Ringling Bros.

The distinction between, on the one hand, a statutory obligation to comply with a permit, and on the other hand, a statutory imposition of liability that may be escaped by compliance with a permit, draws support from the Ninth Circuit's repeated statements that when the terms of an ITS are violated, the agency is liable under section 9. The distinction is further supported by the Ninth Circuit's conclusion that an agency's violation of the terms of an ITS may also cause an actionable violation of the agency's duties under section 7(a)(2), as discussed in the following section.

**2.    The Ninth Circuit Has Held That by Violating An ITS and Failing to Re-Initiate Consultation, Agencies May Violate Section 7**

A pair of Ninth Circuit cases have implied that section 11(g) encompasses a claim that the agency's violation of the terms and

19

conditions of an ITS obligates the agency to reinitiate consultation. Or. Natural Res. Council v. Allen, 476 F.3d 1031, 1034-35 (9th Cir. 2007), Forest Guardians v. Johanns, 450 F.3d 455, 459, 465 (9th Cir. 2006).

Once an ITS has been issued to a federal agency, "The agency must immediately reinitiate consultation with the FWS if the amount or extent of incidental taking [provided by the ITS] is exceeded." Or. Natural Res. Council v. Allen, 476 F.3d 1031, 1034-35 (9th Cir. 2007) (citing 50 C.F.R. § 402.16(a)) ("ONRC"). An agency must also reinitiate consultation when new information reveals effects not previously considered, when the action is subsequently modified in a way not considered in the BiOp, or when a new species is listed. 50 C.F.R. §§ 402.16(b)-(d). This duty arises under the agency's section 7(a)(2) obligation to ensure that its actions are not likely to jeopardize the continued existence of listed species. See Interagency Cooperation -- Endangered Species Act of 1973, as Amended; Final Rule, 51 FR 19926 (1986). ONRC, however, considered a claim that an ITS was rendered invalid by withdrawal of the underlying BiOp, rather than by non-compliance with the ITS. 476 F.3d at 1035.

In a separate suit, the Ninth Circuit held that the duty to reinitiate consultation on the basis of changed conditions may be enforced through an ESA citizen suit. Forest Guardians, 450 F.3d at 465. In Forest Guardians, the Forest Service proposed an action that included various monitoring efforts. In "informal consultation" with FWS, it was determined that if this monitoring

was conducted, the action was "not likely to adversely affect" protected species, such that formal consultation, a BiOp and an ITS were unnecessary. Id. at 459. However, the Forest Service then failed to perform this monitoring. Id. Plaintiffs filed an ESA citizen suit, and the Ninth Circuit held that plaintiffs were entitled to summary judgment on their claim that by failing to perform this monitoring, the Forest Service had breached its duty to reinitiate consultation under ESA § 7 and 50 C.F.R. § 402.16. Id. at 463, 465.

Here, the federal defendants concede that the effect of these cases is that, when an agency violates the terms of an ITS, a private party may bring a citizen suit alleging that by virtue of this violation, the agency's failure to reinitiate consultation violates the agency's statutory duty under ESA section 7(a)(2). The availability of this type of suit demonstrates that the mere fact that a claim requires showing a violation of an ITS does not itself remove the claim from the scope of section 11(g).

There is an obvious difference between a claim seeking reinstitution of consultation and plaintiffs' claim in this suit. An agency may breach its section 7(a)(2) duty to reinitiate consultation even if the ITS was properly adopted and the agency has complied with its terms. See 50 C.F.R. § 402.16 (listing events that trigger a duty to re-consult). However, both types of claims may be based on a showing that an ITS has been violated. The court is unaware of any reason why one type of claim based on such a showing but not the other would be precluded by section

11(g)'s exclusion of suits alleging violation of a permit.

**E.    Effect of The Alternative Enforcement Methods**

Finally, the federal defendants argue that regardless of whether section 11(g)'s implied exclusion of suits alleging permit violations bars plaintiffs' claim, the claim is barred because the alternative applicable enforcement mechanisms provide the exclusive scheme for enforcement.    Although alternative mechanisms are available, defendants have not provided any authority indicating that these methods preclude parallel enforcement via citizen suits.

One of the alternative enforcement mechanisms is plaintiffs' ability to bring a suit compelling reinitiation of consultation and concomitant re-examination of the ITS.    ONRC, 476 F.3d at 1034-35; Forest Guardians, 450 F.3d at 465.    Defendants point to no language in those sections, or in the regulations regarding reinitiation of consultation, indicating that this is the only remedy available to private parties when an agency causes take without complying with an ITS.

The other enforcement alternative is the Services' ability to impose administrative penalties.    Section 11(a)(1) provides for civil penalties issued by the Services, and section 11(b) states that violations of the act may be a criminal offense.    Bennett implied that both of these sanctions could be imposed on federal agencies and agency employees as a result of non-compliance with an ITS.    520 U.S. at 170.    Plaintiffs correctly note that a service cannot file suit against another agency, because such a suit between executive agencies would not present a "controversy" under

Article III, and would raise separation of powers concerns.  See Memorandum from Dawn E. Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, to Jonathan Z. Cannon, General Counsel, Environmental Protection Agency, and Judith A. Miller, General Counsel, Department of Defense, Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act, July 16, 1997, available at http://www.usdoj.gov/olc/cleanair_op.htm. However, when such a suit is unavailable, the Services may nonetheless impose administrative penalties.  Id.; see also ESA § 11(e).

In general, defendants' argument based on the availability of administrative remedies is merely a rephrasing of the argument based on section 11(g)'s implied exclusion of suits alleging permit violations.  Other than the statutory language discussed above, the only authority indicating that the administrative enforcement mechanisms preclude enforcement through citizen suits are two district court opinions considering allegations of violations of other permits issued under other ESA provisions.  Ringling Bros., 502 F. Supp. 2d at 112 (violation of captive-bred wildlife permit), Atlantic Green Sea Turtle, 2005 WL 1227305, *14 (administrative enforcement exclusive option once Incidental Take Permit issued). In both of those cases, however, the district courts had not identified an alleged statutory or regulatory violation separable from the alleged violation of the permit.  As such, the courts refused to treat those suits as alleging a statutory violation. Here, as described above, the Ninth Circuit has indicated that the

alleged conduct directly violates section 9.  Ariz. Cattle Growers'
Ass'n, 273 F.3d at 1239.

**F.    Effect on Other Types of Permits**

A final difficulty with this question relates to possible
effects on the incidental take permit program.  A purpose of the
ITP program is to induce private parties to enter into habitat
conservation plans, as an alternate (and possibly more effective)
mechanism for species conservation.  See Spirit of the Sage Council
v. Kempthorne, 511 F. Supp. 2d 31, 45 (D.D.C. 2007).   If,
notwithstanding the issuance of an ITP, a private party may still
be forced to defend against citizen suits alleging noncompliance
with the ITP, the strength of that incentive will be reduced.
Because of the differences between the statutory and regulatory
provisions governing issuance and enforcement of ITSs and ITPs, the
court does not address whether its present holding applies to suits
alleging take in violation of an ITP.  The court notes, however,
that the ITS framework does not serve any similar incentivizing
purpose, as it applies to agencies under statutory obligation to
initiate in section 7 consultations.

**IV. CONCLUSION**

As noted above, this motion presents a difficult question.
Defendants offer a plausible interpretation of the statute, and by
framing the issue in terms of sovereign immunity, they have
implicated a cannon of construction favoring their interpretation.
Nonetheless, this court must give greater weight to the protective
purpose of the ESA and to the Ninth Circuit's history of

24

application and interpretation of the statute. The
Congressionally-stated purpose of the ESA is to conserve "the
ecosystems upon which endangered species and threatened species
depend." ESA § 2(b); 16 U.S.C. § 1531(b). Courts have held that
the ESA should be construed in light of this purpose, see, e.g.,
Babbitt, 515 U.S. at 699, and allowing greater citizen enforcement
when there is a substantive violation furthers the goal of
environmental protection. Moreover, the available appellate
caselaw does not support defendants' position. The only case to
consider a claim of this type treated the claim as though it was
properly brought as an ESA citizen suit. Mount Graham, 986 F.2d
1568. In another context, the Ninth Circuit has implied that a
citizen suit may be brought even when the success of that suit is
predicated on a showing of a violation of an ITS. ONRC, 476 F.3d
1031, Forest Guardians, 450 F.3d 455. Finally, other Ninth Circuit
cases indicate that when an agency causes take without complying
with an ITS, the agency has violated section 9, thus directly
violating the statute. Ariz. Cattle Growers' Ass'n, 273 F.3d at
1239. Therefore, the court concludes that while the ESA's citizen
suit provision does not encompass suits alleging violations of a
permit, this exclusion does not apply to plaintiffs' claim.

For the reasons stated above, defendants' motion to dismiss
is DENIED.

IT IS SO ORDERED.

DATED: May 5, 2009.

LAWRENCE K. KARLTON
SENIOR JUDGE
25   UNITED STATES DISTRICT COURT